NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Chief, Major Frauds Section
PAUL G. STERN (Cal. Bar. No. 162734)
Assistant United States Attorney
Senior Trial Attorney
Environmental and Community Safety Crimes Section
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2432/0715
    Facsimile: (213) 894-6269
    E-mail:    ranee.katzenstein@usdoj.gov
            paul.stern@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>JOEL BARRY GILLIS,<br><br>       Defendant. | No. CR 14-712-SJO<br><br>UNITED STATES' OPPOSITION TO DEFENDANT JOEL BARRY GILLIS' UNEXHAUSTED *EX PARTE* APPLICATION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ranee A. Katzenstein and Paul G. Stern, hereby files this opposition to defendant JOEL BARRY GILLIS' ("defendant") unexhausted *ex parte* application to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  The government asks this Court to dismiss or grant a stay of the

application to afford the Bureau of Prisons an opportunity to consider, first, the Court's March 31, 2020, recommendation of a temporary furlough so defendant can serve his sentence in home detention during the pendency of the current COVID-19 pandemic; and, second, defendant's recently made request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1). Even if the Court reaches the merits of the instant application for compassionate release, however, the *ex parte* application as framed must be denied.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated:  April 6, 2020                    Respectfully submitted,

                                         NICOLA T. HANNA
                                         United States Attorney

                                         BRANDON D. FOX
                                         Assistant United States
                                         Attorney
                                         Chief, Criminal Division


                                              /s/
                                         _____
                                         RANEE A. KATZENSTEIN
                                         PAUL G. STERN
                                         Assistant United States
                                         Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES...............................................iii

I.      INTRODUCTION...................................................1

II.     STATEMENT OF FACTS.............................................2

        A.    Defendant's Pleas and Sentence..........................2

        B.    Defendant's Offense Conduct.............................3

        C.    Incarceration and Projected Release Date................5

        D.    Defendant's Request for Furlough Recommendation and
              Actions Thereon.........................................5

        E.    Defendant's Current Application for Compassionate
              Release and Failure to Exhaust Administrative Remedies....6

        F.    The Bureau of Prisons' and Congress's Response to
              COVID-19................................................6

              1.    COVID-19-specific safety precautions.............6

              2.    Administrative options available to inmates.......9

III.    LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE....................12

IV.     ARGUMENT.....................................................15

        A.    Defendant Has Failed to Exhaust Administrative
              Remedies, Thus Depriving this Court of Authority to
              Consider His Claims....................................15

              1.    Defendant has not waited the requisite number of
                    days to allow the BOP to consider his claims.......15

              2.    Failure to exhaust cannot be excused.............16

        B.    Defendant Has Failed to Demonstrate an "Extraordinary
              and Compelling" Reason to Allow Release in His Case......19

              1.    Defendant Must Show an Extraordinary and
                    Compelling Reason to Obtain Compassionate Release...19

              2.    Defendant's Individual Circumstances Do Not
                    Support An Early Termination of Defendant's
                    Sentence........................................21

        C.    If Defendant Were Otherwise Eligible, 18 U.S.C. §
              3553(a) Factors Do Not Support a Shorter Sentence........23

i

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                              <u>PAGE</u>

V.    CONCLUSION...............................................24

**TABLE OF AUTHORITIES**

DESCRIPTION                                                      PAGE(S)

**CASES**

Barron v. Ashcroft,
  358 F.3d 674 (9th Cir. 2004)......................................18

Bowles v. Russell,
  551 U.S. 205 (2007)..............................................16

Dillon v. United States,
  560 U.S. 817 (2010)..........................................passim

Eberhart v. United States,
  546 U.S. 12 (2005) ..............................................16

Fort Bend County v. Davis,
  139 S. Ct. 1843 (2019)...........................................16

Landgraf v. USI Film Prods.,
  511 U.S. 244 (1994)..............................................16

Meyers v. Bethlehem Shipping Corp.,
  303 U.S. 41 (1938)...............................................17

Reeb v. Thomas,
  636 F.3d 1224 (9th Cir. 2011).....................................9

Ross v. Blake,
  136 S. Ct. 1850 (2016)...........................................17

Shaw v. Bank of America Corp.,
  946 F.3d 533 (9th Cir. 2019).........................12, 15, 16

United States v. Butler,
  970 F.2d 1017 (2d Cir. 1992).....................................14

United States v. Chambliss,
  948 F.3d 691 (5th Cir. 2020).....................................14

United States v. Colvin,
  No. 3:19CR179(JBA), 2020 WL 1613943 (D. Conn. April 2, 2020).....18

United States v. Ebbers,
  --- F. Supp. 3d. ---, 2020 WL 91399 (S.D.N.Y. Jan. 8, 2020).15, 18,
  19

United States v. Grass,
  561 F. Supp. 2d 535 (E.D. Pa. 2008).........................10, 11

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Greenhut,
    No. 18-CR-48-CAS, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020).......14

United States v. Hamilton,
    715 F.3d 328 (11th Cir. 2013)...................................14

United States v. Mangarella,
    No. 06-CR-151, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020).........14

United States v. Mayer,
    235 U.S. 55 (1914).............................................16

United States v. Nasirun,
    No. 8:99-CR-367, 2020 WL 686030 (M.D. Fla. Feb. 11, 2020).......20

United States v. Perez,
    No. 17CR513-3(AT), 2020 WL 1546422.............................18

United States v. Raia,
    No. 20-1033, 2020 WL 1647922 (3d Cir. April 2, 2020)...........17

United States v. Wages,
    271 F. App'x 726 (10th Cir. 2008)..............................14

United States v. Weidenhamer,
    No. CR016-01072-001-PHX-ROS, 2019 WL 6050264 (D. Az. Nov. 8, 2019)
    ...........................................................12, 13

United States v. Willingham,
    No. CR113-010, 2019 WL 6733028 (S.D. Ga. Dec. 10, 2019).........19

United States v. Willis,
    382 F. Supp. 3d 1185 (D.N.M. 2019).............................14

**STATUTES**

18 U.S.C. § 1341....................................................2

18 U.S.C. § 1343....................................................2

18 U.S.C. § 1349....................................................2

18 U.S.C. § 3553(a).............................................. 1, 23

18 U.S.C. §§ 3582 and 4205(g)..................................11, 21

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                PAGE

**STATUTES**

18 U.S.C. § 3582(c)...............................................passim

18 U.S.C. § 3582(c)(1)............................................ 2, 12

18 U.S.C. § 3582(c)(1)(1)............................................. 19

18 U.S.C. § 3582(c)(1)(A).........................................passim

18 U.S.C. § 3582(c)(2)................................................. 9

18 U.S.C. § 3621(b)................................................... 9

18 U.S.C. § 3622..................................................... 11

18 U.S.C. § 3624(c)(2)............................................... 10

28 U.S.C. § 994(t)................................................... 13

**SENTENCING GUIDELINES**

USSG § 1B1.13.....................................................passim

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3           Defendant JOEL BARRY GILLIS' motion for compassionate release is

4   premature, both because (1) he has not given the Bureau of Prisons

5   (BOP) an opportunity to consider his request for a furlough (which

6   this Court previously recommended) or his eligibility for a transfer

7   to home confinement under the BOP's newly expanded authority, and (2)

8   his motion is unexhausted, and thus beyond this Court's power to

9   adjudicate at this time.  The motion must be stayed or dismissed.

10          "The COVID-19 pandemic is gripping the nation.  But that is a

11  fate that affects all citizens, . . . not simply those incarcerated."

12  Order, <u>United States v. Rodriguez</u>, CR 11-148-JVS, ECF No. 2021 (C.D.

13  Cal. Mar. 21, 2020).  Nevertheless, without satisfying 18 U.S.C

14  § 3582(c)(1)(A)'s mandatory exhaustion requirement or eligibility

15  criteria; based on conjecture about the impact of a significant

16  number of COVID-19 cases at USP Lompoc that arguably present serious

17  health risks to him in view of his impaired lung condition; and while

18  ignoring the 18 U.S.C. § 3553(a) factors, including the seriousness

19  and scope of his offenses, defendant seeks immediate — and permanent

20  — release from custody.  (ECF No. 162, "Application.")  Neither

21  statutory authority nor public health demands that defendant be

22  granted an unqualified abridgment of his sentence (as opposed to a

23  temporary furlough or a transfer to home confinement), which is the

24  relief defendant requests in his application.

25          Defendant's compassionate-release application must be dismissed

26  or stayed for at least for three reasons.  <u>First</u>, the BOP should be

27  given an opportunity to consider defendant's eligibility for a

28  furlough (which this Court recently recommended) or home-confinement

under the recently enacted CARES Act — either of which would address the urgent basis for compassionate release that defendant presents. <u>Second</u>, defendant has failed to comply with the mandatory exhaustion requirement of 18 U.S.C. § 3582(c) — requiring, at a minimum, a stay until that jurisdictional bar lifts (on May 1, 2020).  <u>Third</u>, even if the Court could reach the application's merits, defendant is neither eligible for, nor entitled to, the specific relief he requests in his instant application: namely, <u>permanent</u> release from custody, amounting to a 55% reduction of his original 10-year sentence, even after the COVID-19 crisis has passed.

## II.   STATEMENT OF FACTS

### A.   Defendant's Pleas and Sentence

On January 13, 2015, defendant pleaded guilty to four felony counts, including (1) one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; (2) two counts of mail fraud, in violation of 18 U.S.C. § 1341; and (3) one count of wire fraud, in violation of 18 U.S.C. § 1343.  On November 16, 2015, the Court sentenced defendant to a 120-month term of imprisonment, to be followed by a three-year term of supervised release.  The low-end of defendant's applicable sentencing guidelines range was 188 months. The Court imposed the significantly lower custodial term of 120 months in consideration of defendant's advanced age and assorted infirmities, holding that any longer term would effectively be a sentence of life imprisonment.  Given the leniency already afforded defendant at the time of his sentencing, the government respectfully submits that any further <u>permanent</u> reduction in his sentence in light of the risks presented by the current, albeit temporary, COVID-19 health crisis would be inconsistent with the gravity of the harms

resulting from his offense conduct and would result in a sentence that would not reflect the seriousness of his crimes or afford adequate general deterrence to the type of egregious criminal misconduct defendant committed.[1]

### B.   Defendant's Offense Conduct

For over a decade, defendant operated and promoted a Ponzi scheme, through which hundreds of victim-investors — many of them senior citizens — lost their life savings, resulting in total losses of approximately $135 million.  (Presentence Report ("PSR") ¶¶ 28-29.)

Specifically, between 2001 and 2014, defendant and co-defendant Edward Wishner operated a company called Nationwide Automated Systems, Inc. ("NASI") as a Ponzi scheme.  (PSR ¶ 9.)  They solicited over $350 million from victim investors and used the proceeds of the later investments to make 20% annual Ponzi payments to existing investors as a purported return on their investments.  (PSR ¶¶ 13-16, 28-29.)  Pursuant to defendant's and Wishner's instructions, NASI held itself out to the investing public as being in the business of placing, operating and maintaining automated teller machines ("ATMs"). Defendant and Wishner solicited funds from investors by purporting to sell them ATMs through a sale-leaseback program with a purchase price of between $12,000 to $20,000 per ATM.  They further represented that NASI would maintain and operate the ATMs during the 10-year term of the sale/leaseback agreement, and would pay monthly

---

[1] Defendant has not made any showing in his application that defendant's current health problems, while presenting significant risks in light of the COVID-19 pandemic, would be life-threatening once the COVID-19 threat abates or that they have increased the likelihood that he will not be able to survive his current projected release date of July 2024.

rent to the investor in an amount equal to 50 cents per ATM transaction, and in no event amounting to less than a 20% annual rate of return on the investment.  (PSR ¶¶ 14-16.)

Defendant and his associates falsely represented that NASI had a long track record of delivering profits to investors through their management and collection of transaction fees from thousands of ATM machines that it had leased back from the investors.  Defendant and Wishner produced and sent to investors fictitious monthly account statements that purported to detail the income of each ATM that the investor supposedly separately owned.  (PSR ¶¶ 17-18.)  In fact, NASI did not own or service the vast majority of the ATMs referenced in its investor contracts and statements; most of the ATMs were fictitious; and NASI did not collect any fees or revenue from the operation of the ATMs.  Instead, the payments to investors were funded by money received from new investors.  Even when the Ponzi scheme began to fail in 2014, defendant and Wishner continued to solicit new investors with the hope that they could keep their fraudulent scheme afloat.  (PSR ¶ 23.)

Defendant and Wishner misrepresented the use of investor funds, the expected return on the investment, and the financial condition of NASI.  Between September 2007 and October 2014, when NASI completely collapsed, NASI received over $355 million in investor deposits, of which approximately $335 million was used to fund Ponzi payments to investors.  Approximately 1300 victim-investors lost approximately $135 million over the course of the fraudulent scheme.  (PSR ¶¶ 28-29.)  Many of the victims of the scheme were senior citizens, who stated that they lost their life-long retirement savings to the fraudulent scheme.

Defendant pleaded guilty in January 2015 and the Court sentenced him to 120 months in prison, to be followed by three years of supervised release.  In so doing, the Court applied a substantial downward Booker variance, imposing a term of 120 months when the low-end of defendant's guideline sentence, after credit for acceptance of responsibility, was 188 months.  (PSR ¶¶ 60, 109 (applicable guideline range is 188-235 months).)

**C.  Incarceration and Projected Release Date**

Defendant is currently serving his sentence at USP Lompoc.  His projected release date is July 4, 2024.  Defendant has served only 45% of his total sentence of 120 months.

**D.  Defendant's Request for Furlough Recommendation and Actions Thereon**

On March 27, 2020, defendant filed an Ex Parte Application for Order for Recommendation of Temporary Release on Emergency Furlough. (ECF 156.)  The basis of the request was the risk that the COVID-19 pandemic posed to defendant while incarcerated at USP Lompoc.  The application represented that defendant could be trusted to return to custody once the health emergency abated.  The Court granted this application on March 31, 2020.  (ECF 161.)

On April 1, 2020, defendant sent a letter to the Warden at USP Lompoc requesting both a temporary furlough from custody, consistent with this Court's recommendation, and alternatively a grant of compassionate release from custody, pursuant to 18 U.S.C. § 3582(c)(1)(A).  To date, five days have passed since the submission of defendant's request, and BOP has not yet responded or indicated what action it intends to take in response to defendant's request.

**E.    Defendant's Current Application for Compassionate Release
and Failure to Exhaust Administrative Remedies**

Defendant's compassionate-release application is based on
allegations about the potential for an uncontained COVID-19 outbreak
at USP Lompoc and the unacceptable risks to defendant, given his age
and Chronic Obstructive Pulmonary Disease (COPD) diagnosis, that they
present.  While these allegations parallel the arguments in his
previous request for a temporary furlough, defendant notes that the
health crisis at USP Lompoc has significantly worsened, and the risks
he faces have significantly increased, since the Court issued its
recommendation for the furlough and defendant submitted his request
to the BOP that it act on the furlough recommendation and/or his
request for compassionate release.

**F.    The Bureau of Prisons' and Congress's Response to COVID-19**

1.    <u>COVID-19-specific safety precautions</u>

BOP has taken aggressive steps to protect inmates' health and to
resist the spread of COVID-19.  "[M]aintaining safety and security of
BOP institutions is [the BOP's] highest priority."  BOP, Updates to
BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), <u>available
at</u> <u>https://www.bop.gov/resources/news/20200319_covid19_update.jsp</u>.
Thus, the BOP Director recently emphasized that the "response [to
COVID-19] is the Bureau's top priority."  BOP, Statement from BOP
Director (Mar. 26, 2020) (Statement from BOP Director), <u>available at</u>
<u>https://www.bop.gov/resources/news/20200326_statement_from_director.j
sp</u>.

The BOP has never underestimated the threat of infectious
disease.  To the contrary, the BOP has had a Pandemic Influenza Plan
in place since 2012.  <u>Id.</u>; BOP, Pandemic Influenza Plan---Module 1:

6

1   Surveillance and Infection Control (Oct. 2012), available at

2   https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That

3   protocol is astoundingly detailed, establishing a six-phase framework

4   requiring BOP facilities to begin preparations when there is first a

5   "suspected human outbreak overseas."  Id. at i (emphasis added).

6       At extremely early stages, the Pandemic Influenza Protocol

7   requires BOP facilities to ensure inmates' access to soap, to train

8   them on hand-hygiene practices, and to ensure adequate infection-

9   control supplies.  Id. at 9.  For every phase thereafter (from

10  preliminary preparation, to a response to active pandemic, to

11  recovery), it includes detailed procedures required of every BOP

12  facility.  Id. at 9-11.  These include policies for ensuring for

13  creating "social distance" and for requiring "frequent environmental

14  cleaning of 'high-touch' surfaces."  Id. at 2-3, 6.  Facilities must

15  follow protocols on how to identify sick inmates, track their

16  interactions, and quarantine the exposed.  Id. at 4-5.  They must

17  also establish contingency plans to ensure that medical care is not

18  disrupted, even when faced with an influx of sick inmates.  BOP,

19  Pandemic Influenza Plan---Module 3: Health Care Delivery (October

20  2012), available at

21  https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf.  (The BOP

22  has similar protocols for a wide range of diseases.  See BOP Program

23  Statement No. 6190.04, Infectious Disease Management (June 3, 2014),

24  available at https://www.bop.gov/policy/progstat/6190_004.pdf.)

25      The BOP implemented its Pandemic Influenza Protocol in January

26  2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V

27  (Mar. 31, 2020) ("Action Plan Phase V"), available at

28  https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

7

1    In Phase 1 of that plan, the BOP began developing policies in
2    consultation with the Centers for Disease Control.  See BOP, COVID-19
3    Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP
4    Action Plan"), available at
5    https://www.bop.gov/resources/news/20200313_covid-19.jsp.

6         Since then, the BOP has serially escalated its response.  BOP,
7    Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at
8    https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_co
9    vid19_update.pdf.  On March 13, the BOP moved to Phase 2 of its
10   Action Plan, taking steps to "mitigate the spread of COVID-19" in
11   prisons, for the protection of both inmates and staff.  See BOP
12   Action Plan, supra.  The BOP suspended social and legal visits,
13   curtailed inmate movement, established enhanced screening procedures
14   for inmates and staff, and curtailed staff travel.  Id.  Consistent
15   with the Pandemic Flu Protocol, facilities adopted "modified
16   operations"---including staggered meal and recreation times---to
17   promote social distancing.  Id.  Just five days later, the BOP
18   escalated to Phase 3—taking additional steps, including ensuring that
19   "all cleaning, sanitation, and medical supplies" had been inventoried
20   and were adequately stocked.  Id.

21        Phases 4 and 5 followed in late March.  Beginning March 26, the
22   BOP required all newly admitted inmates to be quarantined or isolated
23   for a minimum of 14 days "or until cleared by medical staff." See
24   Action Plan Phase V, supra.  And, as of April 1, the BOP has
25   instituted a nationwide lockdown.  Id.  For at least a two-week
26   period, "inmates in every institution will be secured in their
27   assigned cells/quarters to decrease the spread of the virus." Id.
28   The BOP has also "significantly decreas[ed] incoming movement.  Id.

8

The gravity and severity of these measures reflect BOP's commitment to fighting COVID-19 and protecting inmates.  And, although the BOP has not been immune from the pandemic, it has "thus far been fortunate in that [its] rate of COVID-19 infection is remarkably low."  Statement from BOP Director, _supra_.  As of 4:00 pm on April 6, 2020--despite tens of thousands of COVID-19 cases across the country and over 146,000 inmates in BOP custody--only 196 BOP inmates have been diagnosed with COVID-19.  All are (or were) isolated from fellow inmates and receiving medical treatment.  As of 4:00 pm on April 6, 2020, there were 23 inmates and 5 staff at Lompoc who had tested positive for the virus.  BOP, COVID-19 Coronavirus (updated daily at 12pm Pacific), _available at_ https://www.bop.gov/coronavirus/index.jsp (last visited April 6, 2020).

Of course, "as warned by the Surgeon General of the United States, [the BOP] expect[s] to have more cases as the virus continues to spread in the general community," but they "will continue to diligently support all persons system-wide while doing everything [they] can to do [their] part in mitigating the spread of the virus."  Statement from BOP Director, _supra_.

2.   Administrative options available to inmates

Inmates with COVID-19-based concerns also have a variety of administrative options they can pursue through the BOP itself.  Although not reviewable by courts, these options include far more flexible remedies than permanent reduction of a sentence under 18 U.S.C. § 3582(c)(2).  _See generally_ 18 U.S.C. § 3621(b) (precluding judicial review of BOP placement decisions); _Reeb v. Thomas_, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (courts lack jurisdiction to review

BOP's placement decisions under 18 U.S.C. §§ 3622-24); <u>United States v. Grass</u>, 561 F. Supp. 2d 535, 537 (E.D. Pa. 2008) (same).

<u>First</u>, the BOP can place vulnerable inmates in home confinement, and it is racing to do so.  <u>See generally</u> 18 U.S.C. § 3624(c)(2). The recently enacted CARES Act, which Congress passed to address the COVID-19 crisis, substantially increased BOP's statutory authority to do so.  <u>See</u> Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020) (allowing BOP to "lengthen the maximum amount of time the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2)).  Under this expanded authority (which came into effect just days ago on April 3, 2020), inmates "do not need to apply to be considered for home confinement." Federal Bureau of Prisons, Home Confinement (April 5, 2020) ("BOP, Home Confinement"), <u>available at</u> <u>https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp</u>.

In his April 3, 2020, memorandum authorizing the BOP to exercise its expanded CARES Act authority, the Attorney General emphasized that "time is of the essence," and he directed the BOP to focus on facilities such as USP Lompoc that have significant numbers of COVID-19 cases within the inmate population.  Attorney General, Memorandum for Director of Bureau of Prisons Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), <u>available at</u> <u>https://www.justice.gov/file/1266661/download</u>. Thus, the BOP is "urgently reviewing all inmates" to determine their eligibility, increasing resources to "review and make appropriate decisions <u>as soon as possible</u>."  BOP, Home Confinement, <u>supra</u>

1  (emphasis added).  Indeed, even before their expanded CARES Act

2  authority came into effect, the BOP had placed "an additional 566

3  inmates on home confinement," bringing the national total to nearly

4  3,500.  Id.; see Attorney General, Memorandum for Director of Bureau

5  of Prisons Re: Prioritization of Home Confinement as Appropriate in

6  Response to COVID-19 Pandemic (March 26, 2020), available at

7  https://www.justice.gov/file/1262731/download.

8      Second, the BOP has authority to grant an inmate a temporary

9  furlough from custody, under 18 U.S.C. § 3622, for "obtaining medical

10  treatment not otherwise available," "visiting a relative who is

11  dying," or "any other significant activity consistent with the public

12  interest."  See BOP Program Statement No. 5280.09, Inmate Furloughs

13  (January 20, 2011), available at

14  https://www.bop.gov/policy/progstat/5280_009.pdf.  Certain COVID-19-

15  related conditions would potentially satisfy the BOP's requirements

16  for such a furlough.  Id.  As noted above, defendant has already

17  sought and obtained a recommendation from this Court for a 30-day

18  furlough.  The BOP has not yet adjudicated that request.

19      Finally, under 18 U.S.C. § 3582(c)(1)(A) — which, unlike BOP's

20  placement decisions, allows for judicial review — the BOP has initial

21  authority to assess inmates' applications for compassionate release.

22  The BOP, which has decades of experience diligently assessing such

23  applications, has detailed regulations setting forth relevant

24  procedures and considerations.  See BOP Program Statement No.

25  5050.50, Compassionate Release/Reduction in Sentence: Procedures for

26  Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019),

27  available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  As

28  noted above, defendant waited until April 1, 2020 to present a

compassionate release request to BOP, along with his request for a temporary furlough from custody.  As a result, given that only three business days have elapsed since the submission of defendant's compassionate release request to the BOP, BOP has not had a reasonable chance to consider the request and there is no record of the BOP's assessment of these factors.

**III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE**

A district court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); <u>see</u> <u>Dillon v. United States</u>, 560 U.S. 817, 824–25 (2010).  Compassionate release is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]"  18 U.S.C. § 3582(c)(1).  This relief, however, is both drastic and permanent it is thus subject to strict statutory conditions.

<u>First</u>, a district court can evaluate a defendant's request for compassionate release <u>only</u> "after the defendant has fully exhausted all administrative rights" before the BOP.  Specifically:

> after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and jurisdictional.  <u>See generally</u> <u>Shaw v. Bank of America Corp.</u>, 946 F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion requirements deprive the court of jurisdiction"); <u>United States v.</u>

Weidenhamer, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2 (D. Az. Nov. 8, 2019) (citing cases).  It cannot be ignored.

Second, in evaluating compassionate-release requests, courts must follow both the statute and relevant, binding policy statements. See id.; 28 U.S.C. § 994(t); USSG § 1B1.13.  Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons, within the meaning of the statute; and (2) that he is not a danger to the community.  18 U.S.C. § 3582(c)(1)(A).  Specifically, the statute requires that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission"--in this case, USSG § 1B1.13.  Id.  As the Supreme Court recognized in Dillon, 560 U.S. at 827, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.

USSG § 1B1.13 explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release.  See 28 U.S.C. § 994(t).  They include, as relevant here, (1) a "terminal illness"; (2) a serious medical condition that "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  USSG § 1B1.13 (other grounds omitted).  USSG § 1B1.13, comment. (n.1(A)-(B)).  "[R]ehabilitation

1   of the defendant is not, by itself, an extraordinary and compelling
2   reason for purposes of this policy statement." Id., comment. (n.3).
3          Defendant bears the burden to prove both that he has "exhausted
4   all administrative rights" and that "extraordinary and compelling
5   reasons" exist to support his motion.  18 U.S.C. § 3582(c)(1)(A); see
6   United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL 509385, at *1
7   (C.D. Cal. Jan. 31, 2020) (defendant bears the burden of establishing
8   entitlement to sentencing reduction); United States v. Hamilton, 715
9   F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2)
10  movant, bears the burden of establishing" eligibility); see generally
11  United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party
12  with an affirmative goal and presumptive access to proof on a given
13  issue normally has the burden of proof as to that issue.").
14         Third, even for defendants who are statutorily eligible,
15  compassionate release is a "rare" and "extraordinary" remedy, within
16  district courts' discretion to deny.  United States v. Chambliss, 948
17  F.3d 691, 693-94 (5th Cir. 2020); United States v. Mangarella, No.
18  06-CR-151, 2020 WL 1291835, at *2-*3 (W.D.N.C. Mar. 16, 2020).
19  Specifically, "it is a rare case in which health conditions present
20  an 'exceptional reason'" to allow for release where detention would
21  otherwise be warranted.  See, e.g., United States v. Wages, 271 F.
22  App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention
23  cases); accord United States v. Willis, 382 F. Supp. 3d 1185, 1188
24  (D.N.M. 2019) ("most courts treat compassionate release 'due to
25  medical conditions [a]s ... a rare event.").  This reluctance to
26  expansively apply compassionate release is grounded in a concern that
27  any less narrow application would yield significant sentencing
28

disparities.  <u>United States v. Ebbers</u>, --- F. Supp. 3d. ---, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

**IV.  ARGUMENT**

Defendant's application should be dismissed because he has failed to exhaust administrative remedies.  Alternatively, the Court should stay consideration of the application until after the BOP has had an opportunity to consider this Court's previously-issued recommendation for a 30-day furlough and/or defendant's eligibility for temporary home confinement under the CARES Act.

**A.  Defendant Has Failed to Exhaust Administrative Remedies, Thus Depriving this Court of Authority to Consider His Claims**

This Court lacks authority to act on defendant's compassionate-release motion at this time.  Under 18 U.S.C. § 3582(c)(1)(A), the Court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "<u>after</u> the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  Because this statutory condition has not been satisfied here, the Court lacks authority to adjudicate defendant's claims.  <u>See</u> <u>Shaw</u>, 946 F.3d at 541.  Moreover, contrary to defendant's assertion, failure to exhaust cannot be excused.

1.  <u>Defendant has not waited the requisite number of days to allow the BOP to consider his claims</u>

Defendant filed his *ex parte* application for compassionate release on April 4, 2020.  However, 30 days have not elapsed, as required by 18 U.S.C. § 3582(c)(1)(A)(i), since he submitted his

request for compassionate release to the BOP on April 1, 2020. Accordingly, the Court should dismiss the application as premature or otherwise stay its consideration until the BOP has had a chance to make an individualized assessment of his eligibility for such relief.

### 2.   Failure to exhaust cannot be excused

"[S]tatutorily-provided exhaustion requirements deprive the court of jurisdiction and, thus, preclude any exercise of discretion by the Court." Shaw, 946 F.3d at 533 (citation omitted).  Given § 3582(c)(1)(A)'s plain language and purpose, the requirements for filing a sentence reduction motion--including the that defendant exhaust administrative remedies or wait 30 days after filing a request with the warden--are jurisdictional.  Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances.  18 U.S.C. § 3582(c).  It thus "speak[s] to the power of the court," Landgraf v. USI Film Prods., 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "adjudicatory authority," Bowles v. Russell, 551 U.S. 205, 212-13 (2007) (quoting Eberhart v. United States, 546 U.S. 12, 16 (2005) (per curiam)).  That conclusion is reinforced by courts' historical powerlessness to modify a sentence once entered.  See Dillon, 560 U.S. at 825; United States v. Mayer, 235 U.S. 55, 67-69 (1914).

However, although the government maintains that § 3582(c)(1)(A)'s time limit is jurisdictional, the point is ultimately academic.  Even if § 3682(c)(1)(A)'s exhaustion requirement is not jurisdictional, it is at least a mandatory claim-processing rule that must be enforced if a party "properly raise[s]" it.  Eberhart, 546 U.S. at 19; see generally Fort Bend County v.

16

1  _Davis_, 139 S. Ct. 1843, 1848-50 (2019).  The government raises the

2  rule here, and it thus must be enforced.

3      COVID-19 does not alter this conclusion.  While judicially

4  created exhaustion requirements may sometimes be excused, a court may

5  not ignore a statutory command.  "[M]andatory exhaustion

6  statutes . . . establish mandatory exhaustion regimes, foreclosing

7  judicial discretion."  _Ross v. Blake_, 136 S. Ct. 1850, 1857 (2016).

8  Thus, exhaustion remains mandatory regardless of a court's view of

9  the merits: "[o]bviously, the rules requiring exhaustion of the

10  administrative remedy cannot be circumvented" simply by "asserting

11  that [an opposing party's argument is] groundless[.]"  _Meyers v._

12  _Bethlehem Shipping Corp._, 303 U.S. 41, 51-52 (1938).

13      Consistent with these rules, numerous courts have rejected

14  similar claims in the context of unexhausted COVID-19-based requests

15  for compassionate release.  "Because defendant failed to exhaust his

16  administrative remedies, his request for compassionate release based

17  on COVID-19 concerns fails."  _United States v. Shah_, No. 10-70-CJC,

18  ECF No. 329, at 3 (C.D. Cal. Mar. 30, 2020).  Absent such exhaustion,

19  the court "does not have authority to grant the requested relief."

20  _United States v. Sloane_, No. 19-CR-10117-IT-11, ECF No. 647, at 2 (D.

21  Mass. Mar. 19, 2020) (noting no request made to the USP Lompoc

22  Warden); _United States v. Gileno_, No. 19-CR-161-VAB-1, 2020 WL

23  1307108, at *3—*4 (D. Conn. Mar. 19, 2020) (denying COVID-19-based

24  compassionate-release motion for lack of exhaustion); _United States_

25  _v. Eberhart_, No. 13-CR-313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal.

26  Mar 25, 2020) (same); _United States v. Neman_, No. 14-521-JAK, ECF No.

27  863, at 4—6 (C.D. Cal. Mar. 30, 2020) (same); _see also_ _United States_

28  _v. Raia_, No. 20-1033, 2020 WL 1647922 (3d Cir. April 2, 2020) (even

1   in the face of the COVID-19 pandemic, upholding the need for strict

2   compliance with the exhaustion requirement "given the BOP's shared

3   desire for a safe and healthy prison environment").

4       Exhaustion is particularly inexcusable for errors that an

5   administrative tribunal is competent to address.  Barron v. Ashcroft,

6   358 F.3d 674, 678 (9th Cir. 2004).  Here, the BOP is not merely

7   competent to address defendant's compassionate-release claims; it is

8   uniquely qualified to do so.  Until First Step Act, the BOP had

9   exclusive authority to adjudicate such claims.  Notably, the First

10  Step Act did not change the factors relevant to compassionate

11  release, only the procedures by which a defendant can raise such

12  claims.  Ebbers, 2020 WL 91399, at *4.  The BOP thus has immense

13  expertise, both in (1) assessing the safety and health of their

14  inmates and (2) managing the administration of their facilities.  As

15  noted above, it likewise has other administrative procedures

16  potentially available for addressing COVID-19-based concerns--none of

17  which defendant has given them an opportunity to evaluate.

18  Exhaustion cannot--but also should not--be excused.  Eberhart, 2020

19  WL 1450745, at *2 (declining to excuse failure to exhaust COVID-19

20  compassionate-release motion); Neman, No. 14-521-JAK, ECF No. 863, at

21  6 (same).

22      Defendant points to two out-of-circuit cases in which courts

23  have excused the absence of administrative exhaustion where delay may

24  risk "catastrophic health consequences."  United States v. Perez, No.

25  17CR513-3(AT), 2020 WL 1546422 at *3; see also  United States v.

26  Colvin, No. 3:19CR179(JBA), 2020 WL 1613943, at *2 (D. Conn. April 2,

27  2020).  These decisions were incorrect.  Absent a showing that

28  defendant's failure to exhaust administrative remedies can properly

be excused, this Court lacks authority to grant relief until 30 days have elapsed since defendant applied for compassionate release with BOP.  18 U.S.C. § 3582(c)(1)(1).  The Court should thus dismiss defendant's application.  At minimum, the Court should stay consideration of the application until the BOP has completed its administrative review.

**B.   Defendant Has Failed to Demonstrate an "Extraordinary and Compelling" Reason to Allow Release in His Case**

Even if the Court had authority to consider the merits of defendant's unexhausted claims, defendant has failed to establish his eligibility for compassionate release.  "The First Step Act did not revise the substantive criteria for compassionate release"--criteria that is set forth in the Sentencing Commission's binding "policy statement," USSG 1B1.13.  <u>Ebbers</u>, 2020 WL 91399, at *4—*5; 18 U.S.C. § 3582(c)(1)(A).  Here, defendant does not identify an "extraordinary and compelling reason warrant[ing]" a permanent reduction of his sentence under that definition.  18 U.S.C. § 3582(c)(1)(A).  He is thus ineligible for compassionate release.

1.   <u>Defendant Must Show an Extraordinary and Compelling Reason to Obtain Compassionate Release</u>

As a matter of law, a defendant is eligible for compassionate release only if he can demonstrate "extraordinary and compelling reasons warrant[ing] such a reduction," "consistent with applicable policy statements issued by the Sentencing Commission." <u>Id.</u>  Thus, as courts have recognized, Congress intended that the "Sentencing Commission, not the judiciary, determine what constitutes an appropriate use of the 'compassionate release' provision." <u>United States v. Willingham</u>, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (noting split in authority).  The Sentencing

Commission's policy statement--USSG § 1B.1.13--is thus binding on this Court.  See Dillon, 560 U.S. at 827; see, e.g., United States v. Nasirun, No. 8:99-CR-367, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020).

"General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement[.]"  Eberhart, 2020 WL 1450745, *2.  Those criteria include, as relevant here:

- The medical condition "of the defendant": specifically, whether the defendant has either a "terminal illness" or a "serious physical or medical condition" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."  USSG § 1B1.13, comment. (n.1(A)(i)-(ii));

- The "age of the defendant": specifically, whether defendant is "at least 65 years old," is "experiencing a serious deterioration in physical or mental health because of the aging process," and has served at least 10 years or 75% of his term of imprisonment.  Id., comment. (n. 1(B)); or

- "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his

illness, age, and family circumstances.  <u>Id.</u>, comment. (n.1(D)).[2]

>    2.   <u>Defendant's Individual Circumstances Do Not Support An Early Termination of Defendant's Sentence</u>

The global COVID-19 pandemic is not a factor specific to defendant's case at all and, while his anxieties are certainly understandable, he offers no particular case-specific facts establishing his eligibility for compassionate release under USSG § 1B1.13.  Although defendant is advanced in age and has health concerns including COPD, the medical records he has attached to his application show that, as of May 3, 2019, he had "normal lung-volume"; "[a]s before, there is minimal scarring or subsegmental atelectasis at the left lung base. Otherwise the lungs remain clear. No acute airspace disease or pulmonary edema"; and "no new acute cardiopulmonary process." (Def. App. Exhibit B.)  In his application for compassionate release, defendant primarily emphasizes the general risk of COVID-19 in conjunction with a health condition that is otherwise manageable while he is in custody, namely, COPD; such arguments are general, wide-ranging, and would apply to essentially every inmate presently in custody who has chronic lung infirmities that are otherwise manageable while they remain in custody.

Considering that defendant has been able to address his health concerns in custody up until now, and the steps BOP has taken and continues to take to address the risks posed by COVID-19 generally,

---

[2] Thus, the Court may consider factors set forth in the relevant BOP regulation governing compassionate release: BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), <u>available at</u> https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Those factors make no material difference here.

defendant's circumstances are not sufficiently extraordinary and compelling to justify the remedy he is now requesting, that is, an immediate and permanent release from custody, even after the COVID-19 crisis is resolved, with service of less than one-half of his original sentence for having fraudulently caused over $120 million in losses to over 1200 victims.   Indeed, defendant's arguments totally overlook the BOP's ability to treat infectious disease.   Even chronic conditions "that can be managed in prison are not a sufficient basis for compassionate release."  United States v. Ayon-Nunez, No. 16-cR-130-DAD, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).   Thus, the Court "cannot assume that the Bureau of Prisons will be unable to manage [any] outbreak or adequately treat [defendant] should it emerge at his correctional facility while he is still incarcerated."  Gileno, 2020 WL 1307108, at *4 (denying compassionate-release motion in COVID-19-related case involving a defendant who raised specific health concerns); accord Shah, No. 10-70-CJC, ECF No. 329, at 3.

Defendant's specific health concerns do not, by themselves, satisfy USSG § 1B1.13: defendant is not, for example, terminally ill, or subject to a serious and unrecoverable condition that makes him unable to "provide self-care" within a BOP facility.   USSG § 1B1.13, comment. (n.1(A)(i)-(ii)).

Indeed, a motions panel of the Third Circuit recently denied a motion for bail pending appeal based on COVID-19 concerns that were argued to be amplified because of the defendant's specific health problems.   In United States v. Davis, No. 19-1604, ECF No. 50 (3d Cir. Mar. 20, 2020), appellant James Davis sought release from custody pending appeal due to a "severe risk of death from COVID-19," and specifically alleged that he was 69 years old and suffered from

1   asthma, heart arrhythmia, high blood pressure, cystitis, and a

2   history of prostate cancer with radiological treatment.  <u>See</u>

3   Emergency Motion for Bail Pending Appeal, <u>United States v. Davis</u>, No.

4   19-1604, ECF No. 43-1 (3d Cir. Mar. 17, 2020).  The appellant further

5   argued that while incarcerated, he lived in a shared cell with bunk-

6   style beds, in a unit housing over 100 inmates, where inmates had

7   close physical interaction.  <u>Id.</u>  The motions panel for the Third

8   Circuit ruled:  "Appellant's Emergency Motion for Bail Pending Appeal

9   Due to Coronavirus Risk is denied.  Appellant may renew the Emergency

10  Motion if he is diagnosed with COVID-19."  <u>Davis</u>, ECF No. 50 (3d Cir.

11  Mar. 20, 2020).

12       Thus, the possibility of COVID-19, even when combined with

13  defendant's health issues relating to COPD, simply is not an

14  extraordinary and compelling reason for the immediate and permanent

15  abridgement of defendant's sentence that he seeks, particularly where

16  an alternative way to address defendant's risk – through a furlough –

17  has already been recommended by this Court.

18       **C.   If Defendant Were Otherwise Eligible, 18 U.S.C. § 3553(a)
            Factors Do Not Support a Shorter Sentence**

19

20       Finally, any compassionate-release decision — even for a

21  statutorily eligible defendant — must also consider the factors under

22  18 U.S.C. § 3553(a).  <u>See</u> 18 U.S.C. § 3582(c)(1)(A)(i).  Defendant

23  addresses none of these factors in his motion.  Those factors, which

24  this Court already considered when imposing defendant's 120-month

25  sentence, do not support his request for premature, permanent

26  release.  They support his original sentence.  Defendant's crimes

27  caused approximately $135 million in actual losses to over 1200

28  individual victims, many of them elderly.  Defendant enjoyed a

                                  23

luxurious lifestyle at the expense of his victims, reducing many to penury and forcing them to come out of retirement and find work to make ends meet.

Granting compassionate release would undermine these factors, resulting in an effective sentence of just over four years — an unjust sentence for defendant's crimes, and far below the 10-year sentence the Court imposed.  Moreover, the Court has already recommended to the BOP a way to effectively address the risk defendant faces from COVID-19 while in custody, namely to grant him a temporary furlough, thereby removing him from the confines of Lompoc while the current pandemic remains a potential threat.  The controlling statutory scheme governing the placement of inmates requires that BOP be afforded a reasonable opportunity to make an individualized determination of defendant's eligibility for such relief, which would fully and adequately address the health risks that defendant has highlighted in his instant application.

V.   **CONCLUSION**

Defendant's application for compassionate release should be dismissed or alternatively stayed pending BOP's timely review of his eligibility for other relief.  Even if the Court could reach the merits of defendant's compassionate relief request, the application should be denied for the reasons set forth above.  Defendant has at most established factual grounds for a temporary furlough from custody or a temporary transfer to home confinement, both of which fall within the purview of the BOP; he has not met the eligibility requirements for permanent reduction of his sentence under 18 U.S.C. § 3582(c).

Finally, the government requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions--including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release.  See 18 U.S.C. § 3582(c)(1)(A).